## GUITAR TRUST ESTATE et al. v. BOYD et al.

### No. 1834.

Court of Civil Appeals of Texas. Eastland.

Nov. 11, 1938.

Rehearing Denied Nov. 11, 1938.

Stinson, Hair, Brooks & Duke, of Abilene, for appellants.

D. M. Oldham, Jr., and R. W. Haynie, both of Abilene, for appellees.

LESLIE, Chief Justice.

September 30, 1938, this court delivered an opinion in this case reversing the judgment of the trial court and remanding the cause for another trial. The appellees have filed a motion for rehearing, presenting various contentions challenging the correctness of the legal conclusions in the original opinion as well as the accuracy of certain statements that seem to have crept into the final draft of the opinion. In deference to these contentions we have re-examined the record and restate our conclusions and the reasons therefor.

The court is of the opinion that the original disposition of the case is a correct one, and the judgment pursuant thereto will not be disturbed in date or in substance. The original opinion will be withdrawn and this one substituted therefor.

The plaintiff S. A. Boyd and husband instituted this suit against the Guitar Trust Estate, an unincorporated association, composed of Earl Guitar, Trustee, and others, to cancel deeds theretofore executed by plaintiffs to defendants conveying lots 17

and 18 in block 134, Thom's Addition to the Town of Hawley in Jones County, Texas. The first count of the petition is in trespass to try title and the second seeks cancellation of certain deeds on alleged grounds of fraud. Defendants answered by general and special denial. Trial was before the court and jury, and upon the latter's answer to special issues judgment was rendered in favor of the plaintiffs, canceling the deeds, etc. The verdict of the jury found the lots to be the separate property of the wife, Mrs. S. A. Boyd, and that she acknowledged the deeds separately and apart from her husband. These findings are not challenged. The remainder of the verdict deemed favorable to the plaintiff will now be considered.

(1) The jury found that the defendants, or their agents, told the plaintiffs, in the negotiations for the purchase of the lots, that it would be impossible to obtain a permit to drill an oil well upon the lots in question; that such statement was false and a material inducement to the plaintiffs in conveying the lots; (2) the jury also found in answer to other special issues, that the defendants and their agents told the plaintiffs that the lots in question had no value, and further found that such statements were false and a material inducement to the plaintiffs to convey the lots.

Other issues and grounds of fraud were submitted but resolved by the jury in favor of the defendants. Still other grounds of fraud were alleged. They were either abandoned or not submitted. If the judgment is to stand it must rest upon one or both of the grounds established by the above findings.

At the conclusion of the trial the defendant asked for an instructed verdict and later for judgment notwithstanding the verdict. The correctness of the verdict and judgment are challenged from many angles as not being supported by the testimony.

The Boyds acquired said lots in 1909. They were then husband and wife and the deed conveyed the property to Mrs. S. A. Boyd in general terms and without separate property recitals. Thus the record stood until the verdict and judgment in this case adjudicated the lots to be her separate property. These lots were part of a regularly platted addition to the town of Hawley. The defendants, or Guitars, in later years becoming the owners of the addition, or about 25 acres surrounding these lots, turned their lots back to acreage, except-

ing from that proceeding the plaintiffs' lots and a few others they did not own. In November, 1936, the Guitars became interested in purchasing the plaintiffs' lots. Through their agent, Rogers, they opened negotiations with the owners for such purchase. The first negotiations between the plaintiffs and the Guitars apparently not being successful, the plaintiff A. S. Boyd was returned to his home by said Rogers, who, on arriving there, reopened the negotiations by making a new offer of $150 or $175. This renewed effort to purchase the lots resulted at that time in the contract of date November 28, 1936, whereby the plaintiffs agreed to sell the lots to the Guitars, or one of them, for $200, subject to good title, etc. In due time plaintiffs furnished abstract and the same was submitted by the defendants to their attorney who passed thereon and rendered an opinion pointing out several defects disclosed by the record title. When plaintiff A. S. Boyd came in to see what progress the deal was making, defendants called in their attorney who read his opinion on the same, or discussed with plaintiff and defendants the merits of the objections raised. Some of the objections pointed out that two judgments had been abstracted against plaintiffs by the banking commissioner and that there were unpaid delinquent state, county and school taxes, etc. The plaintiff was of the opinion that the lien of the abstracted judgments would not "catch" the lots. Some conversation and discussions arose at that time between the defendants and the plaintiff. The plaintiff's testimony reflects in part the substance of it in this manner: "* * * he (John Guitar) just pushed my papers back and says 'Here are your papers, I don't want it' * * * he says 'I don't want it' and says 'I can't do nothing with it.' I said 'What will you give me for it' he says 'I'll risk it for $100—or something that way' I said 'I'll take $125 not to miss getting anything out of the lots.' That is just what I told him, that's the truth and that is what I told him." In this connection, the plaintiff further testified that in this conversation he (Guitar) said: "I wouldn't have room for a slush pit and nobody wouldn't use them; that I couldn't do nothing with them, they were too small."

Following this conversation a deed was prepared reciting a sale of the lots to the defendants for $125. This was taken to the home of the plaintiff where he and his wife executed the same. With reference to this

occasion the plaintiff testified: "Well they came out and my old woman said she didn't want to sign the deed. I told her 'That is the best we can do; sign the deed.' I talked her into the notion of signing it, and she signed it, and I signed it. But they never did read no deed to me that I knew of." Neither of the Guitars were present at said time. This deed was executed and delivered at the residence of the plaintiff January 16, 1937. The $125 consideration was delivered by defendants and accepted by plaintiffs. Nothing further transpired concerning the deal until later when the defendants discovered that the January conveyance called for the lots as being in block 34, where as they were in fact in block 134. The defendants, or their agents, appeared immediately thereafter at plaintiffs' home seeking a correction of this error. Such deed was presented to plaintiffs and each of them signed it with some complaint that they had not received the $200 originally promised them upon the basis of a clear title. The wife signed the deed and as to the husband's attitude toward it he testified: "Well, I says 'I'm not going to sign it.' Well he (Guitar) says 'We can't do a thing without you sign it.' I thought it was all done gone anyhow, I said 'You promised me $200.' * * * When he went out of the door he gave me a dollar. He said 'Here, Slicker, I will give you a dollar.' "

Further relating what was said on this occasion the plaintiff testified: "A. No sir, after she signed it she turned around. I told them 'I am not going to sign it; you promised me $200.' I said, 'You didn't give it to me.' I said 'I am not going to sign it.' They said 'Well I can't do a thing without you sign it.' I thought my lots were gone. I got nothing out of them anyhow. And I just pitched in and signed it." This plaintiff further testified that after the suit was filed one of the Guitars, or their agent, asked him "What did you sue me for, and I said 'Because you didn't pay me and my wife.' "

When asked in that connection if he signed the January deed willingly he answered: "Yes, I signed it. I thought I was getting my $200."

At various points in the testimony each of the plaintiffs restated the complaint at not receiving the $200 originally contemplated. This phase of the testimony need not be further set out, although the thought runs through all of plaintiffs' testimony.

In another portion of her testimony Mrs. Boyd testified that after the deeds were delivered she came to these conclusions: "Just seemed like I hadn't realized it; hadn't studied it over. I decided them lots is worth more. It just seemed like it just came to me that them lots was worth more —well, I thought that all of the time—I thought those lots ought to be worth more. All at once, it just seemed like it wasn't nothing compared to what them lots had ought to be worth, so I wanted to investigate." She further testified that neither of the Guitars had ever discussed with her about the value of the property and that neither of them was present when she signed any of the instruments here involved.

The testimony is further to the effect that when each of the deeds were executed, producing oil wells were within 400 yards of the property which they were conveying. In this manner the facts and circumstances out of which this litigation grows developed from November, 1936, the date of the original negotiations, on down to January 16, 1937, the date of the deed reciting the $125 consideration, and on down to May 27, 1937, the date of the execution of the correction deed.

As stated, the grounds of the alleged fraud were that the defendants falsely "represented to these plaintiffs that the above described lots were of no value and that it would be impossible for them (plaintiffs) to obtain a permit to drill an oil well upon such a small tract of land * * *." We consider the last ground first. It was submitted by special issue No. 3, as follows: "Do you find from a preponderance of the evidence that prior to the execution of the deed dated January 16, 1937, the defendants or their agents told plaintiffs that it would be impossible for them to obtain a permit to drill an oil well upon the lots in question?" At the time these instruments, sought to be canceled, were executed, oil wells had been drilled in about 400 yards of these lots and numerous wells had been completed in that vicinity when the deed of correction was executed May 27, 1937. The plaintiffs had owned the lots since 1909 and resided near them for many years. They knew their size, quality of land and location, and that they were in the vicinity of possible oil producing lands. Any information with reference to the suitableness of the lots for the drilling of an oil well was as available to the plaintiffs as the defendants. If plaintiffs had never seen oil wells,

a derrick or a slush pit, etc., they had an opportunity to see such in the very vicinity of these lots and during the considerable period of negotiations for their sale, stretching from the 28th day of November, 1936, to the final deed of correction May 27, 1937. The record clearly reflects that plaintiffs were mentally and physically capable of understanding any such matters. If, under such circumstances, they failed to inform themselves concerning the correctness of the alleged statements with reference to slush pits, etc., and the general availability of the lots for an oil well, it but evidences such degree of negligence upon their part as bars them from an appeal to equity for relief from injury invited, or carelessly brought upon themselves.

Under such circumstances the rule of law expressed and employed in Staben v. Hernandez, Tex.Civ.App., 292 S.W. 259, is applicable: "The defects in the lot which he did not conceal were as open to her as to him, and, while admitting she went on the lot before she bought, she denies that she knew about the gully. It was her duty to look at the land, which was open and accessible to her. The evidence is insufficient to sustain the judgment. The judgment is reversed, and the cause remanded."

This general rule is stated under the subject of fraud and deceit in 20 Tex.Jur. p. 55, sec. 32, as follows: "In general one must rely on his own judgment and investigate before entering into transactions with others. 'The law does not place a premium on negligence or unreasonable credulity. Prudence and diligence should be exercised in the execution of contracts.'"

Each of these propositions are supported by many authorities cited in the text.

There are no circumstances in this case to take it out of the general rule. The deal was not made suddenly or in secret, but was prolonged in point of time. Two, if not three, deeds involved in the transaction were executed and delivered, the last one being a correction of the main one of January 16, 1937. The testimony reflects no special or fiduciary relations existed between these parties. There is no evidence that either possessed any expert knowledge of the subject matter of the alleged misrepresentations over that possessed by the other. The parties were in the possession of all the facts and the testimony discloses that the chief obstacle, if not the only one

(from plaintiffs' point of view) to the final consummation of the deal was the fact that the Guitars did not pay the $200 originally promised upon the basis of a clear title as contemplated by the contract of date November 28, 1936. The final consideration of $125 actually paid for the lots was evidently given on the assumption of risks, and encumbrances of title, pointed out by the attorney's opinion. Under these circumstances, the deed based upon the consideration for $125 amounted to a confirmation of the original deed.

Further, we are of the opinion that any statement that it would be impossible to obtain a permit to drill on the lots involves a mere opinion which in a large sense, if not altogether, constitutes an opinion upon a question of law; in other words, an expression of a legal opinion not amounting to legal fraud. National Fire Ins. Co. v. Plummer, Tex.Civ.App., 228 S. W. 250, 252; Edge v. Business Men's Assur. Co. of America, Tex.Civ.App., 15 S.W.2d 44; Panhandle & Santa Fe Ry. Co. v. O'Neal, Tex.Civ.App., 119 S.W.2d 1077.

Jurisdiction of substantially every phase of the development of the mineral resources of the State, and especially oil and gas, has in recent years been vested in the Railroad Commission of Texas, or the Oil and Gas Division thereof. The spacing rules applicable to so small a tract of land, contiguous to the property lines and lease lines of others, are not revealed by the record and it is not shown that exceptional grounds existed for the drilling of oil wells nearer than the prescribed distance from said lines of others. It would be useless to speculate on such circumstances, but certain it is the authorities in charge of granting permits were at all times as accessible to the sellers as to the buyers and the opinion of one upon the possibility of obtaining a permit was as good as that of the other. In any event, the question of obtaining a permit is but evidentiary upon the availability of the lots by reason of their size for the drilling of an oil well, and there was ample opportunity for any interested party to obtain all necessary information relative thereto.

We now consider the next ground of recovery, namely, that the lots were falsely represented as having no value. We have been somewhat at a loss to know how to appraise this charge. It appears that no

one connected with the lawsuit considered that the lots were without value. The issue follows the pleading and inquires whether or not the defendants "told plaintiffs that the lots in question had no value."

The plaintiffs purchased this property in 1909, paying therefor $250. It had improvements including a residence which they rented from year to year until they moved it away. It was part of a regular addition to the town of Hawley. Surrounding acreage was valuable for agricultural purposes, cotton, etc. Plaintiffs' land was equally as good. In November, 1936, when these lots became the subject matter of this deal, the plaintiffs deemed them worth $200 and the defendants agreed to give as much, provided good title was shown. After an examination of the abstract reflected some clouds upon the title the plaintiffs were still able to sell the lots for $125 thus encumbered. No witness ever testified that the property was without value and the witnesses differed in their estimates of value, conceded by all to be substantial.

It is unnecessary to further indicate the testimony which shows that the sellers and purchasers well understood that the transaction involved a property of substantial value. The testimony of the plaintiffs reflects such degree of intelligence as would forbid any thought that they could be misled as to value or caused to seriously entertain any delusion or misapprehension concerning the value of the lots. Any reliance by them upon representations that the lots were without value, as submitted by the issues, would indicate an inexcusable neglect or lack of diligence upon their part in the disposition of property of known value. Under the testimony it would have smacked of the purest absurdity for either the buyers to represent that the lots had no value or for the sellers to believe and rely upon such representations.

The record fails to show plaintiffs' reliance on alleged representations of value. In connection with the alleged false representations herein discussed, the plaintiffs alleged that " * * * they unwillingly agreed to sell said lands to the defendants for the sum of One Hundred Twenty Five Dollars ($125.00), protesting at the time (January 16, 1937) that the property was worth more than the sum of $125 * *." In another paragraph of the petition they allege "these plaintiffs at that time (execution of deed of correction May, 1937) again protested that the property was their own property and that they did not want to sign the deed and that the property was worth more money." ·

The owner of the land is presumed to know whether such land is valuable or not. A good analogy is the presumption that he knows the boundaries of the land, its corners and lines and what land is enclosed therein, as held in Rowe v. Horton, 65 Tex. 89. If fraud is to be predicated upon a false representation by a stranger that one's own land has no value, it is not only necessary to prove the exceptional circumstances to justify belief and reliance upon such representation, but a basis therefor should be laid in the pleadings. In 20 Tex. Jur. p. 54, sec. 31, it is stated: "Not only must there have been a reliance upon the alleged false representation, but the party claiming to have been misled and injured must have had a right to rely thereon. Obviously one has no right to rely upon a representation which is expressly stated to be merely an opinion, for the truth of which the speaker declines to be bound. *Nor may one rely upon statements which are palpably absurd.*" (Italics ours.) The text cites ample authority supporting the statement.

There is another reason, probably embraced in those above given, why this ground of recovery is not available to the sellers in this case. It is reflected by the following rule of law to be found in the same text, p. 25, sec. 12, reading as follows: "But if the parties have equal means of knowledge and no artifice or fraud has prevented the person to whom the representation was made from making an examination and forming a judgment in respect to the matter, the representation is to be regarded as a mere expression of opinion. *Statements which frequently come within this rule are those concerning value.*" (Italics ours.) This is so well supported by authority and the rule is so elementary that we merely refer to the authority in the text. In the discussion of the matter in issue of value, it is further said on page 72, sec. 42, of the same text: "We have seen above that it is ordinarily the rule that a mere expression of an opinion as to value which proves to be incorrect or false, is not to be classed as a misrepresentation of the material fact upon which reliance may be placed. Particularly is this the rule where there is nothing to show that

the statement was other than the expression of an honest opinion."

There is another angle from which the testimony in this case must be viewed. On the whole, we consider the statement of facts reflects quite a volume of immaterial personal opinion and trade-talk between these parties, each one sparring for an advantage, and considering the matter from his own standpoint; but on the whole we think it conclusively appears that the general tenor and statement of these negotiations do not rise, or rather descend, to the level of actionable fraud, warranting the cancellation sought. 20 Tex.Jur. p. 71, sec. 41, and authorities.

Further, we are of the opinion that any reasonable interpretation of the testimony setting forth the circumstances surrounding and including the execution of the correction deed of May, 1937, conclusively establishes, when viewed from the standpoint of the appellees, that said deed of correction amounted to a complete ratification of the deed of January 16, 1937, the deed reciting the $125 consideration and containing the wrong block number. It will be remembered that the negotiations for this sale opened November 28, 1936, resulting later in the deed of January 16, 1937, to be followed by the correction deed now under consideration and of date May 27, 1937. There was no fraud proved inducing the execution of the deed of correction and neither does the testimony disclose any circumstance preventing the execution and delivery of that deed from amounting to a waiver of the fraud, if any.

The testimony in the instant case is somewhat voluminous and considerably involved. We have endeavored to give it its proper legal effect. Taking the testimony as a whole and viewing it in the light most favorable to the appellees we are of the opinion, as formerly held, that the judgment of the trial court should be reversed and the cause remanded for another trial.

For the reasons assigned, this opinion is substituted for the former one, the original judgment is left undisturbed and the motion for rehearing is overruled.

GRISSOM, J., disqualified and not sitting.