

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

### NO. 2-07-260-CV

| | |
|---|---|
| CMS ENERGY RESOURCE MANAGEMENT COMPANY F/K/A CMS MARKETING SERVICES AND TRADING COMPANY | APPELLANT AND APPELLEE |
| V. | |
| QUICKSILVER RESOURCES, INC. | APPELLEE AND APPELLANT |

------------

FROM THE 236TH DISTRICT COURT OF TARRANT COUNTY

------------

## MEMORANDUM OPINION[1]

------------

### I. INTRODUCTION

Quicksilver Resources, Inc. (Quicksilver) sued CMS Energy Resource Management Company f/k/a CMS Marketing Services and Trading Company (CMS) for breach of a long-term contract for the sale of natural gas, for rescission, and for fraud in the inducement of that contract. Following a two-

------------

[1] *See* Tex. R. App. P. 47.4.

week trial, a jury deliberated for five days and returned a verdict. Both Quicksilver and CMS moved for judgment on the verdict; ultimately, the trial court signed a judgment for Quicksilver and rescinded the long-term contract, effective from the date of the judgment. Both CMS and Quicksilver have perfected appeals from the trial court's judgment.

CMS raises four issues. First, CMS claims that there is legally insufficient evidence to support the jury's finding that it fraudulently induced Quicksilver into the transaction. Second, CMS argues that Quicksilver did not obtain the necessary jury findings to support rescission of the long-term contract. Third, CMS argues that, in any event, rescission of the entire contract was improper when the contract contained a severability clause. And fourth, CMS argues that the trial court erred by requiring CMS to post a bond to secure the costs of Quicksilver's supersedeas bond. Quicksilver, as appellee, raises a "conditional cross-point,"[2] arguing that the jury's award of zero damages on its fraudulent inducement claim is against the great weight and preponderance of the evidence. Quicksilver, as cross-appellant, raises two issues: first, that the trial court erred by only prospectively rescinding the contract instead of granting

---

[2] For ease of reference, we use the same characterizations as the parties utilized in their briefs when discussing their points and issues.

2

rescission ab initio, and second, that the trial court erred by disregarding the jury's award of $10 million dollars in exemplary damages.

For the reasons set forth below, we sustain CMS's first issue challenging the legal sufficiency of the evidence to support the jury's finding of fraudulent inducement. Because we hold that no evidence exists that CMS made a definitive promise that induced Quicksilver into the contract, we reverse the trial court's judgment and render judgment that Quicksilver take nothing.

## II. FACTUAL AND PROCEDURAL BACKGROUND

On March 26, 1999, CMS and Quicksilver engaged in telephone negotiations that culminated in an agreement before the parties hung up; CMS and Quicksilver agreed that Quicksilver would sell CMS natural gas at a fixed price of $2.47/MMbtu for ten years. As is customary in the industry, the telephone negotiations and, ultimately, the deal reached in the telephone conversation, was recorded.

The recorded March 26, 1999 telephone conversation between the parties was played for the jury multiple times. Marc Pauley, a CMS employee, initiated the March 26, 1999 telephone conversation, speaking with Mike Ryan, a Quicksilver product marketing manager. Eventually, Toby Darden, Quicksilver's Chairman of the Board, and Glenn Darden, Quicksilver's Chief Executive Officer, joined the call via speaker phone with Mike. Andy Coppola,

3

CMS's regional marketing manager, and David Geyer, CMS's vice president of risk management joined the call via speaker phone with Marc Pauley. Unbeknownst to the Quicksilver employees who were participating in the phone conversation, CMS's David Geyer was having a concurrent conversation with Lee Lewis, a CMS risk manager, who, in turn, was on the phone with someone at J. Aron & Co., a New York bank; this trio was discussing a financial hedge concerning the Quicksilver gas.

During the March 26, 1999 recorded telephone conversation, CMS and Quicksilver discussed a "upside sharing provision." The CMS and Quicksilver parties' conversation concerning the "upside sharing provision" was as follows:

(Radio broadcast.)

Mike Ryan:      This is Mike Ryan speaking.
Marc Pauley:    Mike, it's Marc.
Mike Ryan:      Hey, Marc.
Marc Pauley:    I lost you.
Mike Ryan:      Yeah, I was kind of hearing – it was dead air there and I thought maybe we got – maybe we already said what we needed to say. I didn't know.
Marc Pauley:    Oh, I'm sorry. I was just trying to get the three, five, and seven while I had you on the line.
Mike Ryan:      Right. Okay.
Marc Pauley:    Okay. So – okay. 2.26 for the three-year.
Mike Ryan:      Okay.
Marc Pauley:    2.31 for the five-year, 2.35 for the seven-year.
Mike Ryan:      Okay. And very close on the 2.47 for ten?
Marc Pauley:    I'm sorry?
Mike Ryan:      And real close to 2.47?
Marc Pauley:    No, we're there. I got guys here with their hands around my neck if I don't close ten years at 2.47.

4

| | |
|---|---|
| Mike Ryan: | Okay. |
| Marc Pauley: | We've been working on this since 8:00 o'clock. |
| Mike Ryan: | Let me put you on hold right now and try to get that. |
| Marc Pauley: | Okay. |
| (Radio conversation.) | |
| Mike Ryan: | Marc? |
| Marc Pauley: | Yes, sir. |
| Mike Ryan: | I've got Glenn and Toby Darden with us. |
| Marc Pauley: | All right. |
| Unidentified Speaker: | Hey, Marc. Hey, Marc. |
| Marc Pauley: | Hi, guys. |
| Toby Darden: | We're going over this pricing from Consumers. |
| Marc Pauley: | Hey, Glenn and Toby and Mike, you guys want to hang on? I got a couple other people in the room, too, with me. Why don't I just put you on the speaker phone? Guys, are you there? |
| Mike Ryan: | Yeah, I can hear you. |
| Toby Darden: | We're here. |
| Marc Pauley: | Okay. I have Andy Coppola and David Geyer in here with me, too. Go ahead. |
| Toby Darden: | Okay. Marc and David – |
| Andrew Coppola: | Yeah, David is the vice-president of Risk Management Group, guys; and he's the one that's kind of back-stopping this whole thing and making sure that we're getting some accurate pricing information. |
| Toby Darden: | Sure. Well, let me just go over where we think we should be, okay, and why we're having some issues; but we'd love to hear what you have to say about it. But it – it looks like the NYMEX strip for ten years was about 2.39 to 2.40 without basis. That's what our numbers are coming in at, guys; and we're checking them a lot of places. And so that means that your basis is on the order of 6 cents or – 4 cents is what the offer was yesterday. |
| David Geyer: | (inaudible) 2.39 to 2.40. |
| Marc Pauley: | We're just relaying your feedback to somebody who's getting the bid for us, too. |

5

| | |
|---|---|
| Mike Ryan: | Yeah, those are bid prices. Those aren't asks – those aren't even in the range. They were on the – I mean, they were – they were the bid, you know. |
| Toby Darden: | Now, one thing I also wanted to throw into this mix is with Consumers, we have a little benefit – well, actually, with anyone we have a little benefit in being able to deliver the gas through Beaver Creek down directly into your service area and maybe build some additional capacity on your existing system. |
| Marc Pauley: | Well, this is – we're talking about a City Gate deal anyway, right? |
| Toby Darden: | Right. But anyone else going to Consumers is going to pay a dime to go downstream, aren't they? |
| Marc Pauley: | I'm not sure I follow. |
| Toby Darden: | Well, we are in the process of acquiring the Dow Beaver Creek line. |
| Marc Pauley: | Right. |
| Toby Darden: | You're aware of that? |
| Marc Pauley: | Yeah. |
| Toby Darden: | And there's a transportation component to get down to the Consumer area, isn't there, on your part? |
| Andrew Coppola: | There may be. It's just to say this is – you're probably proposing something that may help on our utility better than it would help us in the marketing group here, guys, in maybe we don't – maybe we don't understand that well enough to appreciate it. |
| Toby Darden: | Yeah, okay. Well, I can see that. I mean, it's pretty new; and it's hard to value. But it doesn't change the fact that we seem to be substantially below where NYMEX plus even a reasonable basis for Michigan gas would be. |
| Marc Pauley: | What do you think the basis component ought to be? |
| Toby Darden: | Well, I mean, we're just using if you use a 2.39 to 2.40 ten-year strip for NYMEX. |
| Marc Pauley: | Right. |
| Toby Darden: | And a 10- to 11-cent basis. |
| Marc Pauley: | We were – so that's a .49 versus .47. So we're 2 cents apart. |

6

| | |
|---|---|
| Toby Darden: | .49 to .50, but I didn't say come in the – the rumor was you couldn't get there. You were still around 2.44, 2.45. |
| Marc Pauley: | The last call I made to Mike, which was probably ten minutes ago and we've been on the line since, was that we'd like to close the ten-year at 2.47. We've been working that all morning. |
| Toby Darden: | Okay. Well, I'm sorry. I got part of it. |
| Marc Pauley: | Okay. |
| Marc Pauley: | Well, we're still here. We'd like to do the ten-year. |
| Andrew Coppola: | We're not really putting a big chunk on this, guys; and we'd just like you to realize that we're trying to get you as close as we go along and try to back to back this thing. I agree with your numbers. I think we looked at a pretty wide basis market up here that probably was trading, in the last couple of days, maybe 11 ½ at 16 on the paper side, which would be equivalent to a 9 ½ bid – 9 ½, maybe 10 bid, on the physical index is where it is. I suspect the index is probably going to get tighter but – so I think what we're looking at here is probably not any – any more than – or looking at making anymore than a penny or a penny and a half on this deal. |
| Toby Darden: | Wouldn't that make it about a 2.48 price? |
| Andrew Coppola: | No, 230 – well, now the Market is moving, but I guess conceptually, yeah. |
| Toby Darden: | Well, why don't we make it 2.48 and we'll make a deal? |
| Andrew Coppola: | Let me get a look at it right here because we're going to fill this. Hang on. |
| Toby Darden: | Okay. |
| Unidentified Speaker: | Hey, guys. |
| Andrew Coppola: | Hello. Hello. |
| Unidentified Speaker: | Yeah. |
| Andrew | |

| | |
|---|---|
| Coppola: | With the risk we have laying this thing off, these guys are sitting pretty tight on .47 being a fair price here. |
| Marc Pauley: | That's what they asked for. |
| Marc Pauley: | Just to recap, guys, this is a number that we've been working for you for several days; and, you know, we've run these guys into the ground for the last four hours at .47. It was not a number that we chose. It was a number that we were quoted by Mike, and I think Glenn reiterated it a couple of days ago. |
| Toby Darden: | And from the benefit of a newcomer in here trying to haggle the (inaudible) – |
| Glenn Darden: | How about 2.51, can we do that? |
| Andrew Coppola: | Let me say, again, guys, we do – we do want this to be a win-win and we want you to be happy with it and we want to feel comfortable with it. Considering the business that we're going to do in the future, I hope that you understand we're not trying to take a big gouge out of this. |
| Toby Darden: | I understand, guys. It's not – I mean, we're talking about a penny; and I've been through the numbers on a penny on this size deal. It's not going to make us or break us. So – |
| Andrew Coppola: | I guess we feel the same way. We're not going to take a lot of risk on this, but it's something that's pivotal and it's something that we'd like to do because I think it makes sense for all of us down the road. And we've kind of crossed a lot of hurdles here this morning, and I'm glad we're all finally here together. If we're this close, we'd love to be able to do it. |
| Toby Darden: | Well, let me ask you this: Can we have it deliverable off the Beaver Creek system to Consumers? |
| Andrew Coppola: | I think we'll – I think what we need is we need MMbtus into Consumers. |
| Toby Darden: | Oh, okay. But I mean, can we have – it would help us on our pipeline situation to have it deliverable off that Beaver Creek system. |
| Andrew Coppola: | If Consumers will accept the gas – |

| | |
|---|---|
| Toby Darden: | They will. |
| Andrew Coppola: | I don't want to do anything that – that – |
| Toby Darden: | Yeah, only if they will accept the gas. Let's say conditional upon accepting the gas – |
| Marc Pauley: | And maybe I should add one more piece. I mean, if Mike Shore comes back or anybody out of the group and says, "Sure, for 2 ½ percent fuel and a nickel you can do that," obviously – |
| Toby Darden: | That's not going to work. Yeah. We're just talking about a net number here. |
| Andrew Coppola: | And that number – I think my concern is as long as we get it into the Consumers – if you guys can give us flexibility down the road and there's money to be shared, then we'd be happy to come back to you and say, "Guys, over this ten-year period, these logistics may change." |
| Toby Darden: | Yeah, that's right. |
| Andrew Coppola: | And we'd be happy to come back down the road and say, "If we can save a nickel somewhere, guys, we'll share that with you." |
| Glenn Darden: | I think the best thing we can do is talk to Mike. |
| Toby Darden: | Yeah. That's probably the best way to approach it. Now, to give you guys a little background on another contract we've made, we have the ability on a peaking basis to do things with the gas. I don't know if Mike's talked to y'all about this. |
| Mike Ryan: | No, I haven't. |
| Toby Darden: | But basically there may be some opportunities for both of us to use the supply on some of these wild fluctuations in price. |
| Andrew Coppola: | Oh, absolutely. And we'll stand there – with your supply and we have peaking ability ourselves with the balancing at Consumers, as you guys know – |
| Unidentified Speaker: | You bet. |
| Andrew Coppola: | – I think that there's some great outside opportunities here. |

9

Toby Darden: Yeah. You guys got more strength in the balancing side than we do.

Andrew
Coppola: Right.

Toby Darden: And we might be able to find some markets, you know, on a spiking week or day or a month in winter months or, who knows, summer months, who knows what happens, but maybe to arbitrage the supply a little better price –

Andrew
Coppola: No question.

Toby Darden: Can we work out a 50-50 split on that?

Andrew
Coppola: Absolutely. And I can't – as those things come up, we can talk about any up side that we derive by taking this supply to a higher priced market that has an arbitrage play, absolutely.

Toby Darden: Can we put some kind of general intent language or – you know, I know how lawyers are. So I know how that works – but some sort of indication that we will both work towards the best use of the supply?

Andrew
Coppola: Absolutely. The only thing we can't guarantee is that whenever an arbitrage opportunity comes up, that this supply will be dedicated to that; and it's only because that's what we're doing with a lot of our other supply.

Toby Darden: Right. I understand that, but if we mutually find a specific deal for this supply –

Andrew
Coppola: Oh, absolutely.

Toby Darden: Can we say something like that?

Andrew
Coppola: Yeah. If we change this deal, whether it be short-term or whether it even be, you know, a longer term period of time, somewhere along the course of this ten-year period, we will agree to share that with you folks, whether it – you know, whether you bring us the idea or we bring you the idea.

Toby Darden: That's wonderful. Well, if we can just kind of say that's what our goal is for everybody, we're fine with that; and we'll work a split with you on any deal we come across, hopefully vice versa.

Andrew
Coppola:        Fantastic.  I think there's a lot of opportunities as this market place changes.   We may be moving this gas back into Wisconsin, guys.

Toby Darden:    Yeah, yeah, right.   You know, and I think off the Beaver Creek system, but the truth is, we got to hook the Great Lakes right there, too.

Andrew
Coppola:        Yeah.   And we have presence over at Dawn on the other side.   We have another office on the Canadian side.

Toby Darden:    Oh, great.

Andrew
Coppola:        We can do some arb work at Dawn.

Toby Darden:    Well, let's just see what we can do, and that's wonderful.

Andrew
Coppola:        Do you – I know I don't want to shove this back at you; but I think Marc might even talk to Mike about maybe drafting up a letter of intent.  The contract is going to take a little while, I'm sure.

Glenn Darden:   I think we ought to certainly send a letter of confirmation.

Andrew
Coppola:        That's right.  At least a letter of confirmation subject to the review of a contract, but we're ready to go.  We're going to go ahead and take a position here.

Glenn Darden:   Do you guys want to draft that letter?

Andrew
Coppola:        We could.

Glenn Darden:   Why don't you send us a letter of confirmation?

Marc Pauley:    Okay.  All right.  Are we locking in at 2.47 for ten years, then?

Toby Darden:    That's right.

Marc Pauley:    Okay.  That's MMbtus.

Toby Darden:    That's MMbtus, yes.

Andrew
Coppola:        Okay.

Andrew
Coppola:        Sounds fantastic, guys.  This is a great start.

Glenn Darden:   Hey, we look forward to the relationship.

Andrew

Coppola:                Absolutely.  We'll get that confirmation faxed out to y'all this afternoon.

At Quicksilver's request, CMS sent a March 29, 1999 transaction confirmation to Quicksilver, confirming the terms of the agreement the parties had reached.  The March 29, 1999 confirmation letter memorialized the upside sharing provision by providing under the term "Other" that "Quicksilver and CMS MST agree that if subject gas supply can be scheduled/delivered (whether on spot short-term or long term basis) to derive additional value, that the parties shall share in such additional revenue on a 50%-50% basis."  Quicksilver signed and returned the transaction confirmation, and in March 2000, approximately a year after the deal was struck on the telephone, the parties executed a formal GISB contract[3] and an addendum documenting their agreement.  The GISB contract set forth the upside sharing provision in the exact same language as the confirmation letter under the "special conditions" box.

As natural gas prices rose, a dispute erupted between CMS and Quicksilver concerning the specific "upside sharing provision" that was negotiated in the recorded March 26, 1999 telephone conversation, set forth in the transaction confirmation, and ultimately, placed into the parties' GISB

_____

[3] GISB stands for "Gas Industry Standards Board."  A GISB contract is a form contract that may be utilized in the gas industry.

12

contract. In December 1999, Thad Shumway of Quicksilver contacted Marc Pauley of CMS about the upside sharing provision in the parties' agreement. Marc agreed that CMS had an obligation to perform and said that he might have more time after the first of the year to explore opportunities. Shumway continued to make inquiries of CMS about its performance under the upside sharing provision. But CMS did not respond. By the summer of 2000, both Marc Pauley and Andy Coppola had left CMS's employment. Eventually, in November 2000, Quicksilver filed suit.

CMS and Quicksilver sharply disagreed on the meaning of the upside sharing provision. CMS took the position that the provision meant that if either CMS or Quicksilver became aware of opportunities to increase the value of the contract by changing the delivery point of the gas or the volume of gas delivered and the parties discussed this opportunity and mutually agreed to change the delivery point or the volume of gas to capture such a benefit, then the parties would split any change to the deal that allowed the parties to capture a benefit. Quicksilver took the position that the provision was a "profit-sharing" provision and required CMS to pay Quicksilver fifty percent of any amount over $2.47 that CMS sold the gas for.

13

Quicksilver's breach of contract and fraud in the inducement claims against CMS proceeded to trial.[4] The trial court's charge asked the jury nine questions. The jury found in question number 1 that CMS failed to comply with the parties' contract but found in question number 1A that a condition precedent to CMS's obligation to perform had failed to occur. In question number 2, the jury found zero damages resulted from Quicksilver's loss of upside sharing revenue in the past and future as a result of CMS's failure to comply with the agreement. In question number 3, the jury found that CMS fraudulently induced Quicksilver into the transaction, and in question number 4, it found zero damages in the past and in the future resulted from CMS's fraudulent inducement. In question number 5, the jury found by clear and convincing evidence that the harm to Quicksilver resulted from fraudulent inducement, and in question number 6, the jury awarded $10 million dollars in

---

[4] The trial court previously granted summary judgment for CMS; this court reversed the summary judgment as to Quicksilver's breach of contract and fraudulent inducement claims. *See Quicksilver Res., Inc. v. CMS Mktg. Servs. & Trading Co.*, No. 02-03-00251-CV, 2005 WL 182951, at *2 (Tex. App.—Fort Worth 2005, pet. denied) (mem. op.). Quicksilver's live pleadings characterize this claim as "fraud in the inducement," and Quicksilver labels this claim as such in its appellate brief, stating, "The jury found that CMS fraudulently induced Quicksilver into a ten-year Contract for the sale of natural gas."

14

exemplary damages. The jury did not answer questions 7, 8, 9, or 10[5] because those questions were conditioned on answers contrary to the jury's actual answers.

The trial court signed a judgment for Quicksilver on the jury's verdict. The judgment states that CMS fraudulently induced Quicksilver into signing the GISB dated March 1, 1999, and orders that the contract "is rendered void as of the date of this Judgment and is hereby rescinded." The judgment taxes costs against CMS.

### III. LEGALLY INSUFFICIENT EVIDENCE OF FRAUDULENT INDUCEMENT

In its first issue, CMS claims that there is legally insufficient evidence to support the jury's finding of fraudulent inducement in question number 3. Question number 3 asked:

Did CMS commit fraud against Quicksilver?

Fraud occurs when:

a.    a party makes a material misrepresentation;

---

[5] Question number 7 asked whether Quicksilver entered the contract as a result of a unilateral mistake. Question number 8 asked whether there was a meeting of the minds between the parties when they entered into the contract. Question number 9 asked whether Quicksilver notified CMS of its intent to rescind the contract within a reasonable time. And question number 10 asked what the total amount of revenue Quicksilver would have received for the gas would have been if the gas had not been committed to the Contract, minus the revenue Quicksilver actually received.

15

b. the misrepresentation is made with knowledge of its falsity or made recklessly without any knowledge of the truth and as a positive assertion;

c. the misrepresentation is made with the intention that it should be acted on by the other party; and

d. the other party reasonably relies on the misrepresentation and thereby suffers injury.

"Misrepresentation" means:

a. a false statement of fact; or

b. a promise of future performance made with an intent, at the time the promise is made, not to perform as promised.

Answer "Yes" or "No."

ANSWER: Yes

## A. Which Law Applies

Before we begin our legal sufficiency review of the evidence, we must determine which law applies here. CMS contends that Michigan law defines the elements of Quicksilver's fraud claim because a choice-of-law provision in the GISB contract and its addendum selects Michigan law. CMS argues, however, that Texas law governs the procedure of the case, "[w]hile Michigan substantive law determine[s] *what* facts Quicksilver must prove to establish the elements of fraud, Texas procedure law governs *how* the facts are proved." Quicksilver argues that Texas law applies substantively and procedurally

16

because (1) CMS does not point to Michigan law as requiring any different element of fraudulent inducement not otherwise required under Texas law; (2) CMS does not identify any way that the application of Michigan law would lead to a different result than the application of Texas law; (3) the choice-of-law provision in the GISB applies, if at all, only "to govern the Contract," not to extracontractual tort claims; and (4) in any event, the award of partial rescission is simply a matter of election of remedies, which is governed by Texas procedural law.

Before undertaking a choice-of-law analysis, we look to whether a conflict of law exists. *Sonat Exploration Co. v. Cudd Pressure Control, Inc.*, 271 S.W.3d 228, 231 (Tex. 2008); *Fraud-Tech, Inc. v. Choicepoint, Inc.*, 102 S.W.3d 366, 377 & n.32 (Tex. App.—Fort Worth 2003, pet. denied) (citing *Duncan v. Cessna Aircraft Co.*, 665 S.W.2d 414, 419 (Tex. 1984) (determining that, before undertaking choice of law analysis, the court "must first determine whether there is a difference between the rules of Texas and New Mexico on this issue"), *Young Ref. Corp. v. Pennzoil Co.*, 46 S.W.3d 380, 385 (Tex. App.—Houston [1st Dist.] 2001, pet. denied) (finding no necessity to decide which state's law applied absent a conflict of law on the issues presented), and *St. Paul Surplus Lines Ins. Co. v. Geo Pipe Co.*, 25 S.W.3d 900, 903 n.2 (Tex. App.—Houston [1st Dist.] 2000, no pet.) (op. on reh'g) ("In the absence of a

17

true conflict of law, we do not undertake choice of law analysis.")).  If no conflict of law exists on the issues, we need not decide which state's law applies.  *Fraud-Tech, Inc.*, 102 S.W.3d at 377–78 & n.33 (citing *Young Ref. Corp.*, 46 S.W.3d at 385 and *St. Paul Surplus Lines Ins. Co.,* 25 S.W.3d at 903 n.2).

In its brief, CMS sets out the elements that it contends are required to establish fraud related to an agreement between the parties, i.e., fraudulent inducement, under Michigan law.  The elements of fraudulent inducement under Michigan law are essentially the same as the elements required under Texas law.  *Compare Belle Isle Grill Corp. v. City of Detroit*, 666 N.W.2d 271, 280 (Mich. Ct. App. 2003) (setting forth elements of fraudulent inducement under Michigan law) *with In re FirstMerit Bank, N.A.*, 52 S.W.3d 749, 758 (Tex. 2001) (orig. proceeding) (setting forth elements of fraudulent inducement under Texas law).  The trial court's charge in this case in question number 3 submitting fraud relating to an agreement between the parties constitutes a proper submission of fraudulent inducement under either Michigan or Texas law.  *See Custom Data Solutions, Inc. v. Preferred Capital, Inc.*, 733 N.W.2d 102, 105 (Mich. Ct. App. 2006); *In re FirstMerit Bank, N.A.*, 52 S.W.3d at 758.  Consequently, because no conflict of law exists on the elements of fraud relating to an agreement between the parties—that is, the elements of

18

fraudulent inducement—we need not undertake a choice-of-law analysis. We apply Texas law to this issue.

## B. Standard of Review

We will sustain a legal sufficiency challenge only when (1) the record discloses a complete absence of evidence of a vital fact, (2) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact, (3) the evidence offered to prove a vital fact is no more than a mere scintilla, or (4) the evidence establishes conclusively the opposite of a vital fact. *Uniroyal Goodrich Tire Co. v. Martinez*, 977 S.W.2d 328, 334 (Tex. 1998), *cert. denied*, 526 U.S. 1040 (1999); Robert W. Calvert, *"No Evidence" and "Insufficient Evidence" Points of Error*, 38 Tex. L. Rev. 361, 362–63 (1960). In determining whether there is legally sufficient evidence to support the finding under review, we must determine whether the evidence is such that a factfinder could reasonably form a firm belief or conviction that its finding was true. *Diamond Shamrock Ref. Co. v. Hall*, 168 S.W.3d 164, 170 (Tex. 2005); *Sw. Bell Tel. Co. v. Garza*, 164 S.W.3d 607, 627 (Tex. 2004). We must review all the evidence in the light most favorable to the finding. *Hall*, 168 S.W.3d at 170; *Garza*, 164 S.W.3d at 627. This means that we must assume that the factfinder resolved any disputed facts in favor of its finding if a reasonable factfinder could have done so. *Hall*, 168 S.W.3d at 170; *Garza*,

19

164 S.W.3d at 627. We must also disregard all evidence that a reasonable factfinder could have disbelieved. *Hall*, 168 S.W.3d at 170; *Garza*, 164 S.W.3d at 627. We must consider, however, undisputed evidence even if it is contrary to the finding. *City of Keller v. Wilson*, 168 S.W.3d 802, 817 (Tex. 2005); *Hall*, 168 S.W.3d at 170. That is, we must consider evidence favorable to the finding if a reasonable factfinder could and disregard evidence contrary to the finding unless a reasonable factfinder could not. *Cent. Ready Mix Concrete Co. Inc. v. Islas*, 228 S.W.3d 649, 651 (Tex. 2007); *City of Keller*, 168 S.W.3d at 807, 827. More than a scintilla of evidence exists if the evidence furnishes some reasonable basis for differing conclusions by reasonable minds about the existence of a vital fact. *Rocor Int'l, Inc. v. Nat'l Union Fire Ins. Co. of Pittsburg, PA*, 77 S.W.3d 253, 262 (Tex. 2002).

### C. The Law and Evidence Concerning Fraudulent Inducement

CMS contends that no evidence exists that it made a definitive promise, that is, an actionable misrepresentation to induce Quicksilver into the transaction.[6] Quicksilver points to two categories of allegedly actionable

---

[6] We did not address this issue in the parties' prior summary judgment appeal because CMS did not assert it as a ground for summary judgment on Quicksilver's fraudulent inducement claim. *See Quicksilver Res., Inc.*, 2005 WL 182951, at *2 (explaining that CMS moved for summary judgment on Quicksilver's fraudulent inducement claim only on the ground that CMS had conclusively negated the reliance element of the tort).

20

misrepresentations made by CMS: (1) misrepresentations made in the March 26 telephone conversation and (2) the language of and inclusion of the upside sharing provision in the transaction confirmation and the GISB contract. We will discuss the alleged misrepresentations in the March 26 telephone conversation first.

Concerning the March 26 telephone conversation, Quicksilver points to the following as actionable misrepresentations made by CMS:

- That opportunities would arise in which the gas could be used to take advantage of wild fluctuation in price;

- That the parties would work out a 50/50 split on upside prices;

- That CMS would work towards the best use of the supply.

But an examination of the March 26 telephone conversation transcript reveals that the words "would arise" and "upside prices" were not used by CMS. The parties agreed in the telephone conversation that

> *[I]f* you guys can give us flexibility down the road and there's money to be shared, *then* [CMS would] be happy to come back to you and say, "Guys, over this ten-year period, these *logistics may change*."
>       . . . .
> *If* we [CMS] can *save* [as opposed to make] a nickel somewhere, guys, *we'll share* that with you.
>       . . . .
> [By Quicksilver's Toby Darden:] But, basically, there *may be* [not would be] *some opportunities* for both of us to use the supply on some of these wild fluctuations in price.

21

. . . .

[By CMS's Andy Coppola:] I think that there are some great *outside opportunities* here.

. . . .

[W]e [Quicksilver] *might be able to find* some markets, you know, on a spiking week or day or month in winter months or, *who knows*, summer months, *who knows what happens*, but *maybe to arbitrage the supply* a little better price.

. . . .

[By CMS's Andy Coppola:] *[A]s those things come up, we can talk about any up side that we derive by taking this supply to a higher priced market that has an arbitrage play,* absolutely.

. . . .

[By Quicksilver's Toby Darden:] Can we put some kind of general intent language . . . some sort of indication that we will both work towards the best use of the supply?

. . . .

[By CMS's Andy Coppola:] *If we change this deal*, whether it be short-term or whether it even be, you know, a longer term period of time. . . *we [CMS] will agree* to share that with you folks [at Quicksilver]. [Emphasis added.]

Thus, the first two misrepresentations Quicksilver alleges CMS made during the March 26 telephone conversation are not supported by the record.

Concerning the third misrepresentation Quicksilver claims CMS made during the March 26 telephone conversation—that CMS would work towards the best use of the supply—the record reflects that what Quicksilver's Toby Darden actually requested is, "Can we put some kind of general intent language or – you know, I know how lawyers are. So I know how that works – but some sort of indication *that we will both work towards the best use of the supply*?" [Emphasis added.] CMS's Andy Coppola responds, "Absolutely. The

22

only thing we can't guarantee is that whenever an arbitrage opportunity comes up, that this supply will be dedicated to that; and it's only because that's what we're doing with a lot of our other supply." Thus, to the extent CMS promised to work towards the best use of the supply, it was not an unqualified promise of future performance of the type sufficient to constitute an actionable misrepresentation. *See, e.g., Stiles v. Mem'l Hermann Healthcare Sys.*, 213 S.W.3d 521, 530 (Tex. App.—Houston [1st Dist.] 2007, pet. denied) (recognizing unqualified promise to pay medical bills in exchange for release of negligence cause of action sufficient to constitute misrepresentation supporting fraud action).

Indeed, the representations by both CMS and Quicksilver in the March 26 phone conversation are akin to "trade talk," which does not constitute an actionable misrepresentation and will not support a fraudulent inducement claim.[7] In one case alleging deception in inducing a contract, the Eastland Court of Appeals explained,

---

[7] The March 26 telephone conversation reflects quite a volume of immaterial personal opinion and "trade talk" between these parties. The record reflects that both parties are experienced in the gas industry and possess equal bargaining power. Both Quicksilver's and CMS's representatives talk about the strengths that their respective companies bring to the table. Toby Darden touts Quicksilver's abilities because it is in the process of "acquiring the Dow Beaver Creek line" and "has a hook into the Great Lakes." Andy Coppola counters with CMS's strength on the "balancing side" by virtue of CMS's utility company. The conversation is filled with this type of "trade talk."

23

> There is another angle from which the testimony in this case must be viewed. On the whole, we consider the statement of facts reflects quite a volume of immaterial personal opinion and trade-talk between these parties, each one sparring for an advantage, and considering the matter from his own standpoint; but on the whole we think it conclusively appears that the general tenor and statement of these negotiations do not rise, or rather descend, to the level of actionable fraud, warranting the cancellation sought.

*Guitar Trust Estate v. Boyd*, 120 S.W.2d 914, 919 (Tex. Civ. App.—Eastland 1938, no writ); *see also* 37 Am. Jur. 2d *Fraud and Deceit* § 75 (2001) (explaining the general rule that trade talk will not be construed as importing a representation upon which a charge of fraud may be based at least where the parties deal at arm's length).

Quicksilver relies on *Spoljaric v. Percival Tours, Inc.*, 708 S.W.2d 432, 434–35 (Tex. 1986), for the proposition that a promise to do an act in the future with the intention, design, and purpose of deceiving and with no intention of performing the act may constitute actionable fraud. Quicksilver claims CMS made such a promise here. In *Spoljaric*, however, the jury found that "Upchurch promised Spoljaric that a bonus plan would be implemented to pay Spoljaric a bonus for improvements to Percival's financial condition." *Id*. at 434. Here, question number 3 did not ask the jury to find, and the jury did not find, any specifically identified promise or misrepresentation by CMS. We have reviewed the record extensively and we cannot locate, nor does

24

Quicksilver point to, any specific promise or misrepresentation by CMS during the March 26 telephone conversation that is definite enough, that is specific enough, that is not conditional, and that is not mere trade talk so as to constitute an actionable misrepresentation to support a claim for fraudulent inducement.[8]

In summary, the alleged telephone conversation promises made by CMS are nothing more than if-then promises to consider opportunities to change the terms of the contract to take advantage of arbitrage plays in higher priced markets, to make a 50/50 split if "we might be able to find some markets, you know, on a spiking week or day or a month in winter months or, who knows, summer months, who knows what happens, but maybe to arbitrage the supply a little better price," and that the parties would mutually work towards the best use of the supply. CMS's if-then conditional, indefinite, speculative promises and trade talk will not support a fraudulent inducement claim under the present

---

[8] Quicksilver points to the fact that CMS was negotiating hedges during the March 26 telephone conversation as evidence of CMS's intent not to perform its telephone conversation promises to Quicksilver. Be this as it may, whatever CMS's intent, it does not transform CMS's telephone conversation words into something they are not; for the reasons discussed above, CMS's telephone conversation words were mere trade talk and are not definite enough, specific enough, or unconditional enough to constitute an actionable misrepresentation.

facts.[9] The representations were at best conditional. *See, e.g.*, *Criswell v. European Crossroads Shopping Ctr., Ltd.*, 792 S.W.2d 945, 945 (Tex. 1990); *Hohenberg Bros. v. George E. Gibbons & Co.*, 537 S.W.2d 1, 3 (Tex. 1976) (explaining that "[w]hile no particular words are necessary for the existence of a condition, such terms as 'if,' 'provided that,' 'on condition that,' or some other phrase that conditions performance, usually connote an intent for a condition rather than a promise"); *Ford v. City State Bank of Palacios,* 44 S.W.3d 121, 140 (Tex. App.—Corpus Christi 2001, no pet.) (recognizing same principle); *see also BCY Water Supply Corp. v. Residential Inv., Inc.*, 170 S.W.3d 596, 603–04 (Tex. App.—Tyler 2005, pet. denied) (recognizing statement "amounted to no more than a conditional promise of future performance contingent on BCY's ownership of the property");[10] *Airborne Freight Co. v. C.R. Lee Enter. Inc.*, 847 S.W.2d 289, 298 (Tex. App.—El Paso 1992, writ denied) (holding verbal statement that "if you do your job, we will retain you as a delivery contractor" was a conditional promise). The

---

[9] Interestingly, we have not located a Texas fraudulent inducement case where, as in this case, the seller sues the buyer for fraudulently inducing him into a contract to sell.

[10] We recognize that some of these cases involve negligent misrepresentation claims, which must be predicated on a misrepresentation of existing fact. But we include these cases to show that CMS's alleged promises do not qualify as an actionable misrepresentation under either definition of misrepresentation contained in the trial court's charge.

representations were at best indefinite and speculative. *See, e.g., Transp. Ins. Co. v. Faircloth*, 898 S.W.2d 269, 276 (Tex. 1995) (recognizing that "an expression of opinion about monetary value is not a representation of fact which gives rise to an action for fraud"). The representations were at worst mere trade talk. *See, e.g.*, *Prudential Ins. Co. of Am. v. Jefferson Assocs., Ltd.*, 896 S.W.2d 156, 163 (Tex. 1995) (holding representations that building was "superb," "super fine," and "one of the finest little properties in the City of Austin" were not misrepresentations that would support a fraud action); *Paull v. Capital Res. Mgmt., Inc.*, 987 S.W.2d 214, 218–19 (Tex. App.—Austin 1999, pet. denied) (holding statements that an investment was "low risk" and would "produce large revenues for a long time" were merely dealers' talk); *see also Frost Nat'l Bank v. Heafner*, 12 S.W.3d 104, 112–14 (Tex. App.—Houston [1st Dist.] 1999, pet. denied) (holding facts purportedly constituting misrepresentation lacked probative force sufficient to constitute basis of legal inference of fraud).

The record reflects that no promise by CMS exists in the recorded March 26 telephone conversation that constitutes a definitive misrepresentation sufficient to support Quicksilver's fraudulent inducement claim. And because every person involved in the telephone conversation who testified at trial agreed that the "deal" was completed when the parties hung up the phone, no

27

evidence exists of an actionable misrepresentation that induced Quicksilver into the transaction. That is, considering the evidence in the light most favorable to the verdict and indulging in every reasonable inference that would support it, the proffered evidence on the misrepresentation element of Quicksilver's fraudulent inducement claim does not rise to the level that would enable reasonable and fair-minded people to differ in their conclusions. *See City of Keller,* 168 S.W.3d at 822. The evidence here on the alleged misrepresentations made by CMS in the March 26 telephone conversation, even viewed in the light most favorable to the verdict, simply does not furnish any basis for differing conclusions by reasonable minds about the existence of an actionable misrepresentation. *See Rocor Int'l, Inc.*, 77 S.W.3d at 262; *Kindred v. Con/Chem, Inc.*, 650 S.W.2d 61, 62 (Tex. 1983); *see also Frost Nat'l Bank*, 12 S.W.3d at 112–14. The actual words and phrases used by CMS in the March 26 recorded telephone conversation are subject to but one reasonable conclusion; they are at most conditional, indefinite, speculative promises or mere trade talk and will not support an action for fraudulent inducement.

We next turn to the second category of misrepresentations relied upon by Quicksilver. Quicksilver claims that CMS fraudulently induced it into the contract by virtue of the promise set forth in the "upside sharing provision" in the transaction confirmation and the GISB contract. We agree with Quicksilver

28

that the "upside sharing provision" set forth in the confirmation transaction and the GISB contract—that "*if* subject gas supply can be scheduled/delivered (whether on a spot short-term or long term basis) to derive additional value, *that* the parties shall share in such additional revenue on a 50%-50% basis,"—lends itself better to Quicksilver's contention that CMS fraudulently induced Quicksilver into the contract by agreeing with no intent to perform that every time during the ten-year contract that CMS sold gas it had purchased from Quicksilver for more than $2.47 MMbtu it would give fifty percent of sales price over $2.47 to Quicksilver. [Emphasis added.]

Testimony at trial established that entities engaged in the gas industry customarily record telephone conversations; the parties did so here and agree that when they concluded their phone conversation, they "had a deal."[11] Thus, any promise by CMS that would make it responsible for inducing Quicksilver to enter into the contract necessarily must have occurred during the recorded

---

[11] Every person who participated in the March 26 telephone conversation and testified at trial testified that the parties had "a deal" before their March 26 telephone conversation concluded. Toby Darden testified that CMS and Quicksilver "had a deal" when they hung up the phone. Marc Pauley testified that CMS and Quicksilver "had a deal" when he hung up the phone on March 26. David Geyer testified that CMS and Quicksilver "had a deal" when they concluded the March 26 telephone conversation. Mike Ryan testified that the deal was consummated over the telephone. Andy Coppola testified that when he hung up the phone on March 26, "CMS had a deal with Quicksilver for the sale or purchase of this gas." Thus, this fact was conclusively established.

telephone negotiations. *See, e.g.*, *Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc.*, 960 S.W.2d 41, 48 (Tex. 1998); 37 Am. Jur. 2d *Fraud and Deceit* § 106 (2001) (recognizing that for tort of fraudulent inducement pertinent point in time is when misrepresentation is made and relied upon to induce contract).[12]   That is, the language of the upside sharing provision as set forth in the transaction confirmation and the GISB contract could not have induced Quicksilver into the contract because it was not in existence when the parties reached a deal and concluded their phone conversation. *See Haase v. Glazner*, 62 S.W.3d 795, 797–98 (Tex. 2001) (explaining the distinction between the tort of fraud and the tort of fraudulent inducement and noting that the tort of fraudulent inducement presupposes that misrepresentation induced party to enter a contract).

Quicksilver brought a breach of contract claim against CMS, specifically asserting that CMS had breached the contractual "upside sharing provision." The jury found that a condition precedent to CMS's performance had not yet occurred, apparently indicating that the jury accepted CMS's construction of the "upside sharing provision."   While Quicksilver possessed a breach of

---

[12] While, in light of the GISB contract's merger provision, parol evidence was not admissible to vary the terms of the written contract, the parties' verbal negotiations that culminated in a "deal" are determinative for the tort of fraudulent inducement. *See, e.g., Spoljaric*, 708 S.W.2d at 434 (party's intent determined at time party made representation).

contract claim based on CMS's alleged failure to comply with the upside sharing provision set forth in the transaction confirmation and the GISB contract, no fraudulent inducement claim exists based on the language of the upside sharing provision because the parties already "had a deal." *See id.* The fact that CMS allegedly later did not comply with the upside sharing provision it included in the transaction confirmation and the in GISB contract may constitute a breach of contract, but it did not fraudulently induce Quicksilver into the deal consummated at the conclusion of the March 26 telephone conversation.

We sustain CMS's first issue.

## IV. SUPERSEDEAS ISSUE

In its fourth issue, CMS complains that the trial court abused its discretion by requiring CMS, as the judgment debtor, to post a bond for the costs (bond premiums) Quicksilver incurred obtaining a supersedeas bond required by the trial court. Because the trial court possessed discretion to fashion this type of ruling concerning security for a judgment for something other than money or an interest in property, we overrule CMS's fourth issue. *See* Tex. R. App. P. 24.1(e), 24.2(a)(3).

## V. CONCLUSION

Having sustained CMS's first issue and overruled CMS's fourth issue, we need not address CMS's other issues. *See* Tex. R. App. P. 47.1 (requiring

31

appellate court to address only issues necessary to disposition).  We likewise need not address Quicksilver's conditional cross-point.  *See id.*  Because we have held that the evidence is legally insufficient to support the jury's fraudulent inducement finding, we overrule the two issues raised by Quicksilver as cross-appellant:  first, that the trial court erred by only prospectively rescinding the contract instead of granting rescission ab initio, and second, that the trial court erred by disregarding the jury's award of $10 million dollars in exemplary damages.

We reverse the trial court's judgment and render judgment that Quicksilver take nothing.  *See* Tex. R. App. P. 43.2(c).

SUE WALKER
JUSTICE

PANEL: DAUPHINOT, GARDNER, and WALKER, JJ.

DELIVERED:  June 25, 2009

32